AO 242 (12/11)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

# UNITED STATES DISTRICT COURT

for the

Eastern District of Arkansas

| | |
|---|---|
| BENJAMIN MATTHEW MELTON  <br><br> _____ <br> *Petitioner* <br><br> v. <br><br> Warden, FCI Texarkana Low <br> _____ <br> *Respondent* , <br> *(name of warden or authorized person having custody of petitioner)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. ___5:26 cv-00024___ <br> *(Supplied by Clerk of Court)* |

FILED USDC TXEC
FEB 23 2026 PM 1:30

## PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

### Personal Information

1.     (a) Your full name:   Benjamin Matthew Melton

        (b) Other names you have used:   N/A

2.     Place of confinement:

        (a) Name of institution:   FCI

        (b) Address:   FCI Texarkana Low

                       P.O. Box 7000 Texarkana, Tex. 75505

        (c) Your identification number:   Reg. No. 50533-177

3.     Are you currently being held on orders by:

        ☑ Federal authorities       ☐ State authorities       ☐ Other - explain:

4.     Are you currently:

        ☐ A pretrial detainee (waiting for trial on criminal charges)

        ☑ Serving a sentence (incarceration, parole, probation, etc.) after having been convicted of a crime

          If you are currently serving a sentence, provide:

              (a) Name and location of court that sentenced you:   Western District of Oklahoma (Oklahoma City)

              (b) Docket number of criminal case:   5:23-cr-00099-JD-1

              (c) Date of sentencing:   01/26/2024

        ☐ Being held on an immigration charge

        ☐ Other *(explain)*:   N/A

AO 242 (12/11)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

## Decision or Action You Are Challenging

5.    What are you challenging in this petition:

☑How your sentence is being carried out, calculated, or credited by prison or parole authorities (for example, revocation or calculation of good time credits)

❑Pretrial detention

❑Immigration detention

❑Detainer

❑The validity of your conviction or sentence as imposed (for example, sentence beyond the statutory maximum or improperly calculated under the sentencing guidelines)

❑Disciplinary proceedings

❑Other *(explain)*: _____

_____

_____

6.    Provide more information about the decision or action you are challenging:

(a)  Name and location of the agency or court:    Western District of Oklahoma (Oklahoma City)

_____

(b)  Docket number, case number, or opinion number:        5:23-cr-00099-JD-1

(c)  Decision or action you are challenging *(for disciplinary proceedings, specify the penalties imposed)*:
Calculation of Credit for Time Served.

_____

_____

(d)  Date of the decision or action:    01/26/2024

## Your Earlier Challenges of the Decision or Action

7.    **First appeal**

Did you appeal the decision, file a grievance, or seek an administrative remedy?

❑Yes                    ☑No

(a)  If "Yes," provide:

(1)  Name of the authority, agency, or court:  N/A

_____

(2)  Date of filing: _____

(3)  Docket number, case number, or opinion number: _____

(4)  Result: _____

(5)  Date of result: _____

(6)  Issues raised: _____

_____

_____

AO 242 (12/11)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

_____

_____

(b) If you answered "No," explain why you did not appeal:  _____

_____

8.    **Second appeal**

After the first appeal, did you file a second appeal to a higher authority, agency, or court?

☐ Yes                    ☑ No

(a) If "Yes," provide:

    (1)  Name of the authority, agency, or court: _____

    (2)  Date of filing: _____

    (3)  Docket number, case number, or opinion number: _____

    (4)  Result: _____

    (5)  Date of result: _____

    (6)  Issues raised: _____

_____

_____

_____

_____

_____

(b) If you answered "No," explain why you did not file a second appeal:  _____

_____

9.    **Third appeal**

After the second appeal, did you file a third appeal to a higher authority, agency, or court?

☐ Yes                    ☑ No

(a) If "Yes," provide:

    (1)  Name of the authority, agency, or court: _____

    (2)  Date of filing: _____

    (3)  Docket number, case number, or opinion number: _____

    (4)  Result: _____

    (5)  Date of result: _____

    (6)  Issues raised: _____

_____

_____

AO 242 (12/11)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

(b)  If you answered "No," explain why you did not file a third appeal:    N/A

10.  **Motion under 28 U.S.C. § 2255**

In this petition, are you challenging the validity of your conviction or sentence as imposed?

☐ Yes          ☑ No

If "Yes," answer the following:

(a)    Have you already filed a motion under 28 U.S.C. § 2255 that challenged this conviction or sentence?

☐ Yes          ☑ No

If "Yes," provide:

(1) Name of court:  N/A

(2) Case number:

(3) Date of filing:

(4) Result:

(5) Date of result:

(6) Issues raised:

(b)    Have you ever filed a motion in a United States Court of Appeals under 28 U.S.C. § 2244(b)(3)(A), seeking permission to file a second or successive Section 2255 motion to challenge this conviction or sentence?

☐ Yes          ☑ No

If "Yes," provide:

(1) Name of court:

(2) Case number:

(3) Date of filing:

(4) Result:

(5) Date of result:

(6) Issues raised:

AO 242 (12/11)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

_____

_____

_____

    (c)    Explain why the remedy under 28 U.S.C. § 2255 is inadequate or ineffective to challenge your conviction or sentence: _____

_____

_____

_____

_____

_____

_____

_____

11.    **Appeals of immigration proceedings**

Does this case concern immigration proceedings?

☐ Yes        ☑ No

If "Yes," provide:

(a)    Date you were taken into immigration custody: _____

(b)    Date of the removal or reinstatement order: _____

(c)    Did you file an appeal with the Board of Immigration Appeals?

    ☐ Yes        ☐ No

    If "Yes," provide:

    (1) Date of filing: _____

    (2) Case number: _____

    (3) Result: _____

    (4) Date of result: _____

    (5) Issues raised: _____

_____

_____

_____

_____

_____

(d)    Did you appeal the decision to the United States Court of Appeals?

    ☐ Yes        ☐ No

    If "Yes," provide:

    (1) Name of court: _____

    (2) Date of filing: _____

    (3) Case number: _____

AO 242 (12/11)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

    (4)  Result: _____

    (5)  Date of result: _____

    (6)  Issues raised: _____

_____

_____

_____

_____

_____

_____

12.    **Other appeals**

Other than the appeals you listed above, have you filed any other petition, application, or motion about the issues raised in this petition?

☐ Yes          ☑ No

If "Yes," provide:

    (a)  Kind of petition, motion, or application:   N/A _____

    (b)  Name of the authority, agency, or court: _____

_____

    (c)  Date of filing: _____

    (d)  Docket number, case number, or opinion number: _____

    (e)  Result: _____

    (f)  Date of result: _____

    (g)  Issues raised: _____

_____

_____

_____

_____

_____

_____

### Grounds for Your Challenge in This Petition

13.    State every ground (reason) that supports your claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**GROUND ONE:**   The Federal Bureau of Prisons ("BOP") should calculate and apply Earned Time credits to Melton's files in accordance with the First Step Act ("FSA"), 18 U.S.C. § 3632(d)(4)(A).

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

(a)  Supporting facts *(Be brief.  Do not cite cases or law.)*:

Please see Memorandum of Law in Support.

(b)  Did you present Ground One in all appeals that were available to you?

☐ Yes          ☑ No

**GROUND TWO:**  N/A

(a)  Supporting facts *(Be brief.  Do not cite cases or law.)*:

(b)  Did you present Ground Two in all appeals that were available to you?

☐ Yes          ☐ No

**GROUND THREE:**  N/A

(a)  Supporting facts *(Be brief.  Do not cite cases or law.)*:

(b)  Did you present Ground Three in all appeals that were available to you?

☐ Yes          ☐ No

AO 242 (12/11)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

**GROUND FOUR:**    N/A

(a)  Supporting facts *(Be brief.  Do not cite cases or law.)*:

(b)  Did you present Ground Four in all appeals that were available to you?

☐ Yes                    ☐ No

14.    If there are any grounds that you did not present in all appeals that were available to you, explain why you did not:

## Request for Relief

15. State exactly what you want the court to do:  The court should GRANT Melton's habeas action. Specifically, the the court should direct respondent to review Melton's case files and calculate and award applicable Earned Time credits without delay and in accordance with the court's guidance concerning what constitutes a qualifying EBRR program or PA and what constitutes a "day" under the FSA.

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

## Declaration Under Penalty Of Perjury

If you are incarcerated, on what date did you place this petition in the prison mail system:

February 18 2026

I declare under penalty of perjury that I am the petitioner, I have read this petition or had it read to me, and the information in this petition is true and correct. I understand that a false statement of a material fact may serve as the basis for prosecution for perjury.

Date: February 17 2026

_Signature of Petitioner_

_Signature of Attorney or other authorized person, if any_

Page 10 of 10

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

BENJAMIN MATTHEW MELTON,

      Petitioner,

v.

WARDEN, FCI Texarkana,

      Respondent.

Civil No. 5:26-cv-_____
Crim No. 5:23-cr-00099-JD-1

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

COMES Petitioner, BENJAMIN MATTHEW MELTON ("Melton"), appearing *pro se,* and in support of this memorandum would show as follows:

## I. STATEMENT OF JURISDICTION

Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 2241, which confers authority on district courts to issue writs of habeas corpus for prisoners who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(a), (c)(3). Because Melton challenges the Bureau of Prisons' execution of his sentence—specifically, its calculation of his First Step Act Earned Time Credits—this petition properly arises under § 2241, without reliance on the § 2255(e) savings clause.

1

## II. STATEMENT OF THE GROUND FOR REVIEW

Whether the Federal Bureau of Prisons ("BOP") should calculate and apply Earned Time credits to Melton's files in accordance with the First Step Act ("FSA"), 18 U.S.C. § 3632(d)(4)(A).

## III. STATEMENT OF THE CASE

### A.    Procedural Background

On March 9, 2023, a grand jury sitting in the United States District Court for the Western District of Oklahoma, Oklahoma City Division, returned a one (1) count Indictment charging Melton. See Doc. 1.[1] Count 1 charged Melton with Felon in Possession of Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). *Id.* The Indictment also contained Forfeiture Allegation, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c). *Id.*

On May 5, 2023, a Change of Plea Hearing was held and Melton entered a plea of guilty as to the single count Indictment. See Docs. 24, 25.

On January 26, 2024, Melton was sentenced to a term of 63 months' Imprisonment, 3 years Supervised Release, no Fine or Restitution, and a Mandatory

---

[1] "Doc." refers to the Docket Report in the United States District Court for the Western District of Oklahoma, Oklahoma City Division in Criminal No. 5:23-cr-00099-JD-1, which is followed by the Docket Entry Number. "PSR" refers to the Presentence Report in this case, which is immediately followed by the paragraph ("¶") number.

Special Assessment Fee of $100. See Docs. 41, 42.

### B.    Statement of the Facts

#### 1.    Offense Conduct

On December 21, 2022, Oklahoma City Police responded to a domestic disturbance involving Melton. Firearms and ammunition were recovered from the residence, leading to his indictment for being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1).

#### 2.    Plea Proceeding and Presentence Report Calculations and Recommendations

On May 5, 2023, a Change of Plea Hearing was held before Judge Jodi W. Dishman. See Doc. 24. Melton pleaded guilty to the single count Indictment. See Doc. 25

The PSR assessed a Base Offense Level of 20. Melton received a 2-level increase pursuant to U.S.S.G. § 2K2.1(b)(1)(A) because he possessed firearms resulting in an adjusted offense level 22. After receiving a 3-level adjustment for acceptance of responsibility, Melton's Total Offense Level was calculated to be 19. The PSR determined that Melton had a total of thirteen (13) criminal history points, placing him in Criminal History Category VI. Thus, based on a Total Offense Level of 19 and a Criminal History Category of VI, Melton's sentence guideline range for

3

imprisonment was 63 - 78 months.

### 3.    Sentencing Proceeding

On January 26, 2024, a Sentencing Hearing was held before Judge Jodi W. Dishman. See Doc. 41. The Court sentenced Melton to a 63-month imprisonment. See Doc. 42. It is followed by a 3-year Supervised Release. *Id.* The Court also ordered a Mandatory Special Assessment Fee $100. *Id.* No direct appeal was filed in this case.

## IV. **COGNIZABLE CLAIMS IN A PETITION FOR WRIT OF HABEAS CORPUS UNDER 2241**

A petition for habeas corpus under 28 U.S.C. § 2241 must be filed in the district of confinement. See *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013). This Court has jurisdiction to hear Melton's petition because it is the district where he is incarcerated. Melton's claim is cognizable under § 2241 because he challenges the Bureau of Prisons' execution of his sentence—specifically, its calculation of First Step Act Earned Time Credits.

## V. **DISCUSSION**

As a preliminary matter, Melton respectfully requests that the Court be mindful that "a *pro se* complaint should be given liberal construction, we mean that if the essence of an allegation is discernible ... then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the

4

proper legal framework." See *United States v. Kayode*, 777 F.3d 719 (5th Cir. 2014); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (same).

## Melton is in Custody in Violation of Federal Sentencing Statutes Because the BOP Miscalculated His Sentence

1.    Eligible EBRR Programs and Productive Activities

Under 18 U.S.C. §§ 3635(3) & (5):

- An "evidence-based recidivism reduction program" (EBRR) is a group or individual activity that:

    1.    Has been shown by empirical evidence to reduce recidivism or is likely effective based on research;
    2.    Helps prisoners succeed in the community upon release; and
    3.    May include academic classes, substance abuse treatment, vocational training, prison jobs, and other enumerated activities.

- A "productive activity" (PA) is a group or individual activity designed to allow prisoners with low or minimum risk of recidivism to remain productive, which may include delivering EBRR programs to other prisoners.

Melton contends that these broad definitions, coupled with § 3632(d)(4)(A)'s mandatory "shall" language, leave little room for agency discretion. The statute requires the BOP to award time credits for all qualifying programs and activities, regardless of whether they are listed in the FSA Approved Programs Guide ("Guide") or assigned based on an assessed need. Qualifying programs existed prior to the FSA's

5

enactment, negating the BOP's requirement that they appear in the Guide. The statute contains no qualifiers restricting Earned Time Credits (ETCs) to programs assigned based on identified needs.

Congress was explicit when it intended the Attorney General or BOP to act in developing the risk-and-needs "System" under § 3632(a), but it did not delegate discretion in awarding time credits under §§ 3632(d)(4) or 3635(3) & (5). The mandatory "shall" language supports Melton's position that the BOP must award ETCs for all qualifying activities. Considering the FSA's goals—to combat overincarceration, enhance public safety, and reduce recidivism—the statute leaves no ambiguity, and no deference to BOP interpretations is warranted.

Even if deference were considered, Melton argues that the BOP's interpretations conflict with the statute's plain meaning. While §§ 3632(a) & (b) require the BOP to assign programming based on risk and need to target resources efficiently, this does not limit the broad award of ETCs for all qualifying activities. The BOP's approach disadvantages prisoners with minimal assessed needs, who may have fewer opportunities to earn credits, and relies on tools that are not fully reliable. Consequently, the BOP's interpretation risks arbitrary awards of ETCs.

At a minimum, the court should find a genuine ambiguity in the statute regarding what constitutes qualifying EBRR programs and PAs. Reconciling the broad definitions

6

of §§ 3635(3) & (5) with Congress' directive to develop a risk-and-needs system creates this ambiguity. The court should recognize that strictly limiting credit to activities listed in the Guide and tied to an assessed need—especially early in the FSA's implementation—could unfairly deny credit.

The court must scrutinize the BOP's line between permissible interpretation and unbounded discretion. While the Guide may currently be underinclusive, it can facilitate consistent national administration, streamline ETC awards, and provide transparency for inmates. The statute also supports linking risk-and-needs assessments with programming assignments, and the BOP's interpretations, though imperfect, are arguably a permissible implementation of its administrative expertise.

However, courts should not defer to overly mechanical assessments of inmate needs. For example, completing the Residential Drug Abuse Program (RDAP) demonstrates a substance abuse need sufficient to earn credit, even without a formal FSA assessment or assignment. Accordingly, the BOP should not deny ETCs to inmates who complete RDAP after December 21, 2018, based on the absence of an identified need or formal assignment. The Guide itself confirms that standard RDAP credits are available at 44 institutions, while only four offer the dual-diagnosis Co-Occurring Disorder version—underscoring that credit eligibility is broad and not limited to specific program versions.

7

2.   Calculation of Time Credits –What Constitutes a "Day"?

Melton contends that he should earn 10 (or 15) days of time credit for every 30 days in which he successfully participate in an EBRR program or PA, regardless of the length of time in which he participated on any given day. Citing the Sentence Computation Manual, PS 5880.28 at 1-12, CN-02 (July 29, 1994), Melton insists this interpretation is consistent with the BOP's long-standing sentencing computation practices wherein it calculates any part of a day in custody serving a sentence as a full day served on the sentence and any part of a day in official detention as a full day for prior custody time credit purposes—unless the sentencing court specifically imposed a sentence for a term of hours. In contrast, while the BOP insists it could have interpreted a day to mean 24-hours, it did not because such an interpretation would provide too little credit to incentivize participation in the programs and activities as Congress intended. Instead, it interpreted a day as eight (8) hours to correspond with an average workday

> "In interpreting a statute, we look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825, 830 (9th Cir. 1996)(internal quotation marks and citation omitted). *** "Where a statutory term is not defined in the statute, it is appropriate to accord the term its 'ordinary meaning.'" *Northwest Forest Resource Council*, 82 F.3d 825, 833 (internal quotation marks and citation omitted). When there is no indication that Congress intended a specific legal meaning for the term, the court may look to

8

> sources such as dictionaries for a definition. See *Muscarello v. United States*, 524 U.S. 125, 118 S.Ct. 1911, 1914-16, 141 L.Ed.2d 111 (1998)(relying upon dictionaries, literature, and newspaper reports, in addition to legislative history, to ascertain the meaning of the word "carry").

*U.S. v. Mohrbacher*, 182 F.3d, 1041, 1047-48 (9th Cir. 1999).

First, when Congress drafted the subject language and chose to award time credits based on days, not hours, of participation, it is reasonable to presume that involved agency stakeholders were aware of the BOP's well-established practice of awarding a full day of credit for any amount of time in custody or detention, unless the sentencing court imposed a sentence of an exact term of hours. Accordingly, the court is persuaded that Congress likely intended the term "day" to take on this same legal meaning and that it is fair to hold the BOP to its established use of the word. In addition, Congress in essence defined the relationship between days of time credits and days of successful program participation as a 1:3 or 1:2 ratio: "[a] prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities" and "shall earn an additional 5 days [for a total of 15] of time credits for every 30 days of successful participation." 18 U.S.C. § 3632(d)(4)(A). This reinforces the view that, as with its former practice of giving a full day of time credit for any amount of time served or in detention, Congress intended that a "day" mean any part of day. Interpreting a "day"

9

as 8-hours would significantly water down the time credit to participation ratio and diminish inmate incentive to participate in programming, especially for those serving shorter sentences. While respondent argues that there is still an opportunity for inmates with shorter sentences to earn a "substantial reduction as a percentage of their overall sentence," and gives an example of how a low-risk inmate with a two-year sentence could, in theory, earn credits totaling 10% of the sentence after factoring potential good conduct credit, the legislative history surrounding the passage of the FSA, in addition to the language itself, is not consistent with a finding that Congress intended such a modest potential time reduction.

Second, since the program entries in the Guide delineate the number of total available hours and recommended number of days and/or sessions for completion, defining what constitutes a day of "successful participation" is relatively straightforward. For example, the Anger Management program in the Guide describes a course of twelve (12) weekly one-and-a-half-hour Cognitive Behavioral Therapy ("CBT") sessions for completion. Under Melton's interpretation, an inmate could tally one day of successful participation for every therapy session attended. This example and respondent's concern over perverse incentives underscore why the court should reject the BOP's 8-hour "average workday" interpretation. In addition to the Anger Management program, a brief scan of the Guide reveals that numerous programs do not

10

lend themselves to the workday analogy. Instead, the number of hours needed to successfully participate in and complete these programs and activities varies greatly. A day of successful participation in the Anger Management program is one-and-a-half hours, whereas a day of successful participation in a UNICOR job is "full or shared half time." Comparing the value of participation in these programs based on the number of hours an inmate dedicates to each program in any given day is akin to comparing apples to oranges. Were all or most of the programs and activities work-like in nature with average workday-like hour recommendations, respondent's interpretation might be reasonable, but that is not the case. Many of the programs and activities, appropriately identified as valuable programs warranting inclusion in the Guide, involve education, therapy, and treatment.

In *Hare* at *12, the district court concluded that the "BOP's interpretation of a "day" is reasonable because it incentivizes approved EBRR programs and PAs equally, dependent on the total number of hours of participation[,]" rather than incentivizing prisoners "to participate in only those programs that require fewer hours per day." This reasoning is facially appealing, but when fully considered it does not lend itself to the stated goal of incentivizing approved EBRR programs and PAs equally. To the contrary, it incentivizes inmates to bypass programs whose successful participation and successful completion require fewer hours per day even if they were assigned based on

11

an identified need. Moreover, where the BOP has an alternative vehicle for defining what constitutes "successful participation" based on the best practices and goals of a specific program or activity as set forth in its description in the Guide, by defining a day as any part of the day, it can guard against unfair award of credits for too little daily effort without discouraging inmates from participating in valuable programs that target their individual needs.

*Delahoz v. Spaulding*, No. 1:21-cv-01204, 2021 WL 3884350, at *4-5 (M.D. Pa. Aug. 31, 2021), exemplifies why an interpretation defining a "day" as any part of a day (particularly given the BOP's ability to ascertain the parameters for successful participation and successful completion of programs based on their descriptions in the Guide) is consistent with Congress's intent to incentivize inmates to participate in targeted programming to meet their identified needs and why an interpretation defining a "day" as eight hours does not. In *Delahoz,* the court found that the petitioner completed two qualifying PAs related to his identified criminogenic needs in finance/poverty and substance abuse: Money Smart for Older Adults and the Non-Residential Drug Treatment Program. Relying on the BOP's 8-hours interpretation, it found petitioner accrued 52 (of the 240) hours of eligible programming needed to earn 10 (or 15) days of time credit. Under this interpretation, he would need to complete almost five times more programming to earn his first 10 (or 15) days of

12

time credit. Contrast this with an interpretation that defines a "day" as any part of a day. Under the same facts, and assuming petitioner complied with the recommendations for participation and completion in the Guide, he would earn a day for each of the fourteen sessions of the Money Smart program he attended and a day for each of the twelve to sixteen sessions of the drug treatment program he participated in for a total of 26-30 days of successful participation in a PA—enough for, or just few days shy of, the 30 days of successful participation necessary to earn 10 (or 15) days of time credit. The court should conclude that the latter interpretation tracks with Congress' intent to incentivize participation by awarding time credits for successful completion of targeted programming, and that the former does not.

3.    Timing of ETCs Calculations

Melton maintains that Congress intended inmates earn time credits without delay after their initial risk and needs assessments and completion of qualifying programming. To support this position, he note that the statute prioritizes program placement based on release date; that it contemplates the phase-in period would continue even as inmates participate in and complete programs and activities; that it prohibits the award of credits before the FSA went into effect on December 21, 2018, suggesting credits would be available after that date; and it provides that the award of credits before the phase-in period, i.e., between December 2018 and January 2020, is discretionary,

13

thereby suggesting that it is mandatory after.

> Courts have divided on the issue of whether habeas claims seeking the application of ETCs are ripe. Several have concluded that such claims will not become ripe until January 15, 2022, the end of the phase-in period. See, e.g., *Cohen v. United States*, No. 20-cv-10833, 2021 WL 1549917, at *2-3 (S.D.N.Y. Apr. 20, 2021); *Kennedy-Robey v. FCI Pekin*, No. 20-cv-01371, 2021 WL 797516, at *4 (C.D. Ill. Mar. 2, 2021); *Hand v. Barr*, No. 1:20-cv-348, 2021 WL 392445, at *5 (E.D. Cal. Feb. 4, 2021), report and recommendation adopted, 2021 WL 1853295 (E.D. Cal. May 10, 2021); *Llewlyn v. Johns*, No. 5:20-cv-77, 2021 WL 535863, at *2 (S.D. Ga. Jan. 5, 2021), report and recommendation adopted, 2021 WL 307298 (S.D. Ga. Jan. 29, 2021); *Herring v. Joseph*, No. 4:20-cv-249, 2020 WL 3642706, at *1 (N.D. Fla. Jan. 6, 2020). At least one court, the District of New Jersey, has concluded otherwise. See *Goodman v. Ortiz*, 207582, 2020 WL 5015613, at *6 (D.N.J. Aug. 25, 2020).

*Delahoz*, No. 1:21-cv-01204, 2021 WL 3884350, at *2 n.1 (M.D. Pa. Aug. 31, 2021).

**Fact [see Exhibit 1]:** Melton's current Medium PATTERN score is not the result of any failure to rehabilitate himself or a lack of effort toward self-improvement. Rather, it stems from the Bureau of Prisons' improper categorization of his conviction as a "violent offense." Melton's conviction under 18 U.S.C. § 922(g)(1)—felon in possession of ammunition—is not a violent crime under recent precedent, including *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), and *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc). By misclassifying § 922(g)(1)—felon in possession of ammunition—as a "violent" offense, the Bureau of Prisons improperly inflated Melton's violent PATTERN score (26) by approximately

14

8 to 10 points, causing him to be designated as Medium Risk instead of Low Risk. This classification contradicts controlling and persuasive authority holding that § 922(g)(1) is not inherently violent. Also, the Court applied — a two-level enhancement under the U.S. Sentencing Guidelines because firearms were found in the residence he shared with his significant other, Sherri Dolman ("Dolman"). Those firearms were owned by Dolman, who lawfully possessed them and lived in the same home. Thus, Melton's sentence was enhanced not because of any violent conduct or unlawful firearm use, but merely because other firearms were present in the shared household. The enhancement did not convert his offense into a crime of violence. However, this enhancement was later relied upon by the Bureau of Prisons to improperly classify his § 922(g)(1) conviction as "violent" for PATTERN risk scoring.

In *Bruen*, the Supreme Court emphasized that firearm possession—standing alone—is a constitutionally protected activity under the Second Amendment and cannot automatically be treated as dangerous or violent without a demonstrated nexus to criminal misuse. Following *Bruen*, the Third Circuit in *Range*, held that the government could not categorically disarm individuals with nonviolent felony convictions under § 922(g)(1), finding that mere possession of ammunition or a firearm, absent violent conduct, does not make one a danger to society.

Under these precedents, Melton's conviction for possession of ammunition does

15

not qualify as a violent offense for purposes of risk assessment or First Step Act eligibility, and the BOP's contrary treatment has unlawfully inflated his PATTERN score and denied him earned time credit toward early release.

Furthermore, Melton has pursued administrative relief through the BOP Administrative Remedy Program. *Id.* He filed BP-8 and BP-9 requests challenging his FSA ineligibility and the misclassification of his offense. Despite providing documentation of his program completions and the nonviolent nature of his conviction, his grievances were denied without substantive review. Further administrative efforts would be futile, as the BOP has adopted a fixed position that his offense is violent. Continued delay would only prolong an unlawful deprivation of liberty.

It is important to note that, since entering federal custody, Melton has maintained an exemplary institutional record and shown steady progress toward rehabilitation. *Id.* He is currently housed at FCI Texarkana, Low    and classified at a low security level, with a medium PATTERN score (General 48, Violent 26). Despite this classification, the BOP's own documentation confirms that Melton has no incident reports, no disciplinary history, and no detainers, and that he has maintained a consistent work record and positive adjustment. *Id.* Additionally, Melton has earned his GED/High School Diploma and demonstrates verified educational completion in multiple courses. His Individualized Needs Plan – Program Review (Sept. 24, 2025)

16

shows successful completion of seven (7) educational programs and one (1) formal work program, including: Law School for Everyone (Parts 1 and 2), ACE Entrepreneurship – Business Ownership, Strategic Thinking Skills Part 1, ACE CDL Program, Fitness Business Concepts, Yoga 1 (MWF 5 PM), and BLAST and ABS Fitness Training. *Id.* He is also currently enrolled in Advanced Leather Craft (ongoing through Sept. 2026) and has already completed Introduction to Leather earlier in 2025. *Id.* His program review notes explicitly commend him for "maintaining clear conduct and a job since his last team." Melton's Individualized Needs Assessment indicates that he is currently participating in programs addressing his remaining needs in the areas of financial/poverty awareness, antisocial peers, and substance abuse. The assessment further notes that he has "no need" for additional programming in education, cognition, medical, or behavioral interventions, reflecting his ongoing progress, stability, and successful rehabilitation. His health status is "CARE Level 1 – Healthy or Simple Chronic Care," and he has no medical restrictions. *Id.*

More so, Melton's UNICOR work assignment began on March 11, 2024, in Panel Management/Sanding at the UNICOR Mill 5 Plant. *Id.* This full-time position contributes to his vocational development and provides verifiable work performance hours. The FSA Recidivism Risk Assessment (Sept. 15, 2025) confirms that Melton's "Work Programs = 1" and "Programs Completed = 7," yielding reductions to his

17

PATTERN risk factors for education and employment. *Id.*

Under the FSA Time Credit Assessment (July 26, 2025), Melton has accumulated 519 program days—all accepted and undisputed—without any disallowed time. These program days translate to 180 days of earned time credit, though the Bureau has not applied them due to his erroneous "violent" classification. Melton's report also confirms complete Financial Responsibility Program compliance, with all assessments fully paid, and consistent monthly contributions.

In summary, official BOP data document that Melton: (1) has completed or is enrolled in 9 structured programs, including advanced vocational and entrepreneurial coursework; (2) has worked continuously in UNICOR industrial employment since March 2024; (3) has no incident reports and no detainers; (4) has paid all financial obligations; and (5) has earned 519 program days (170 days FTC) that remain unapplied solely due to misclassification. *Id.* These records clearly establish that Melton is fully rehabilitated, compliant, and productive, with every statutory indicator of a low-risk, eligible inmate under the First Step Act.

To reiterate, Melton successfully completed 519 program days and 835 hours of UNICOR work, which equates to at least 180 days (approximately six months) of earned time credit at the 10-day rate. Had his offense been correctly classified as non-violent, and had his risk level been adjusted to Low, he would be eligible for the

18

15-day rate, totaling approximately 255 days (approximately 8.5 months) of credit.

Applying these credits would advance his projected release from November 14, 2027 to approximately March 2026, qualifying him for immediate or near-term release to community placement under § 3624(g).

Melton essentially argues that the unwarranted sentencing disparity factor must be determined only with reference to those comparably situated defendants who were sentenced at the time of Melton's sentencing and those being sentenced today under a different sentencing structure. Melton is now, in effect, to be re-sentenced today, after the passage of the FSA.

In *Goodman*, where the BOP did not dispute the petitioner was entitled to 120 days of ETCs, the narrow issue before that court was whether he was entitled to immediate application of those time credits under the FSA or whether the BOP could delay their award until January 15, 2022. Here, there is no agreement as to whether Melton is entitled to any time credits, let alone how many.

These arguments notwithstanding, *Goodman*'s reasoning is persuasive. Even though that court acknowledged that the statute does not explicitly require the BOP to apply prisoner earned credits, it found that the ordinary meaning of "phase-in" combined with the statutory framework of § 3621(h), including the provision prioritizing program placement during the phase-in period to inmates nearest their

19

release dates, "unambiguously supports the conclusion that the BOP must gradually implement the risk and recidivism program, including the priority application of incentives to prisoners whose release dates are nearer." Accordingly, the court should conclude that Congress intended the BOP to award ETCs without delay to inmates who complete qualifying programming and to consider them for transfer to community corrections or supervised release when sufficient credit is earned. While the phase-in provisions allow the BOP to expand its offerings and extend opportunities to participate in programming to all inmates over the course of the phase-in period, a determination that the BOP may delay awarding time credits to inmates that complete qualifying programming is contrary to the statute.

Finally, Melton has established a verified and stable release plan demonstrating readiness for successful community reintegration. His mother, Dawn Marie Robertson ("Robertson"), has executed a sworn Affidavit of Responsibility dated April 2025, affirming her commitment to provide housing, transportation, food, and general support upon his release. See Exhibit 2.

Robertson resides at 720 Via Sevilla, Mesquite, Texas, and has pledged to offer Melton a stable and drug-free home environment, assist him with employment transportation, and help him reestablish financial independence until he can fully support himself. This sworn affidavit confirms that Melton has a secure and structured

20

living arrangement available immediately upon release. *Id.*

The affidavit further satisfies BOP's requirements for Community Transition and Release Planning, ensuring that Melton's reentry will occur in a supervised, supportive, and law-abiding household. This arrangement eliminates any institutional or public safety concerns and supports his request for immediate release or placement in home confinement under 18 U.S.C. § 3624(c) and § 3621(b).

Accordingly, Melton respectfully prays that this Honorable Court give due consideration to the foregoing and expedite its review and ruling in the interest of justice and judicial efficiency.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Petitioner respectfully requests that this Court issue a writ of habeas corpus directing the Bureau of Prisons to correctly calculate and apply his earned time credits under 18 U.S.C. § 3632(d)(4)(A), and to adjust his projected release date accordingly.

Respectfully submitted,

Dated: February 17, 2026

BENJAMIN MATTHEW MELTON
REG. NO. 50533-177
FCI TEXARKANA
FEDERAL CORR. INSTITUTION
P.O. BOX 7000
TEXARKANA, TX 75505
Appearing *Pro Se*

22